Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| MILDRED MAISONET RODRÍGUEZ<br><br>Recurrida<br><br>v.<br><br>BELLA INERNATIONAL, LLC /d/b/a ACURA DE SAN JUAN; COOPERATIVA DE AHORRO Y CRÉDITO VILLA COOP AGUSTÍN BURGOS RIVERA<br><br>Recurrente | KLRA202400031 | *REVISIÓN JUDICIAL*<br>Procedente del Departamento de Asuntos del Consumidor<br><br>Querella Núm.: SAN-2022-0012250<br><br>Sobre: Ley Núm. 5 de 23 de abril de 1973 |
| --- | --- | --- |

Panel integrado por su presidenta, la Jueza Brignoni Mártir, el Juez Candelaria Rosa, la Jueza Álvarez Esnard y la Jueza Díaz Rivera.

Álvarez Esnard, jueza ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 25 de septiembre de 2024.

Comparece Bella Internacional LLC ("Bella International") mediante un *Recurso de Revisión Judicial.* Nos solicita la revocación de una *Resolución* emitida el 17 de noviembre de 2023, notificada el 21 de noviembre de 2023, por el Departamento de Asuntos del Consumidor de San Juan ("DACo"). Por virtud de la misma, la agencia declaró *Ha Lugar* la *Querella* presentada por la señora Mildred Maisonet Rodríguez ("señora Maisonet Rodríguez" o "Querellante" o "Recurrida") en torno a un alegado incumplimiento del servicio de garantía en el contexto de una compraventa de un vehículo de motor.

Por los fundamentos que expondremos a continuación, **confirmamos** la *Resolución* administrativa recurrida.

Número Identificador

SEN(RES)2024_____

## I.

El 25 de agosto de 2022, la señora Maisonet Rodríguez radicó una *Querella* ante el Departamento de Asuntos del Consumidor.[1] En ajustada síntesis, alegó que el **30 de octubre de 2019** adquirió un vehículo de motor marca Acura (modelo RDX 2020) por el precio cierto de $54,500.00. Señaló que el **3 de enero de 2020** acudió al Centro de Servicios de la entidad querellada para atender un ruido proveniente de la consola del automóvil. Adujo que luego de múltiples visitas a ese taller, la parte querellada no corrigió el desperfecto del ruido en incumplimiento del servicio de garantía.[2] En vista de lo anterior, peticionó (1) la resolución del contrato compraventa, (2) la compensación en daños y perjuicios, más (3) la imposición de costas y honorarios de abogado.

Por su parte, el 19 de junio de 2023, Bella International sometió su *Contestación a la Querella*.[3] En esencia, argumentó que la reclamación presentada no expone una causa de acción que amerite la concesión de un remedio. Arguyó, además, que los daños alegados se derivan de la falta de mantenimiento o alteraciones no autorizadas por la parte peticionaria. Añadió que no ha actuado de manera negligente, dolosa o culposa. Por lo anterior, solicitó la desestimación de la querella presentada.

Luego de una serie de trámites procesales, el DACo celebró dos (2) vistas administrativas.[4] Examinada la prueba oral y documental presentada por las partes, el 17 de noviembre de 2023, la agencia emitió *Resolución*, notificada el 21 de noviembre

---

[1] Apéndice de parte recurrente, págs. 5-13
[2] *Íd.*, págs. 57-131.
[3] *Íd.*, págs. 26-29.
[4] De acuerdo con la información recogida en las trascripciones de la prueba oral, la agencia celebró este proceso administrativo el **8 de septiembre de 2023** y **1 de noviembre de 2023**.

de 2023, en la cual declaró *Ha Lugar* la *Querella* presentada.[5] Al respecto, formuló las siguientes determinaciones de hechos:

1. La parte querellante se identifica como Mildred Maisonet Rodríguez, Consultora de Recursos Humanos y Gerencia para varios clientes en distintos pueblos de la isla y es residente de Gurabo, Puerto Rico, en adelante, la querellante.

2. Con motivo de su trabajo, que requiere adiestrar a empleados de forma presencial, la querellante tiene que desplazarse en su carro a diversas partes de la isla. Aunque su horario regular es de 8:00 a.m. a 5:00 p.m., en ocasiones, sus labores se extienden hasta horas de la noche. Por tal razón, la querellante requiere un vehículo en óptimas condiciones para trabajar.

3. La parte coquerellada Bella International, LLC., es una compañía de responsabilidad limitada activa, conforme surge del Registro de Corporaciones del Departamento de Estado, con número de registro 4158, inscrita desde el 30 de septiembre de 1963. La dirección postal de su oficina principal es P.O. Box 190816, San Juan, Puerto Rico, 00919.

4. La parte querellada Bella International, LLC., h/n/c Acura de San Juan es el representante autorizado de fábrica de los vehículos Acura en Puerto Rico, en adelante, Bella International.

5. La parte coquerellada Cooperativa de Ahorro y Crédito Villa Coop Agustín Burgos Rivera, es una entidad que se rige baja la "Ley General de Sociedades Cooperativas de Puerto Rico de 2004", Ley Núm. 239 de 1 de septiembre de 2004, según enmendada, y que advino cesionaria del contrato de ventas al por menor a plazas por la totalidad del precio del auto objeto de la querella. En adelante, nos referiremos a esta parte como Villa Coop.

6. El 30 de octubre de 2019, la querellante adquirió en el dealer Acura de San Juan, un vehículo nuevo, marca Acura modelo RDX del 2020, número de serie 5J8TC1H37LL005693 y tablilla JIR-024, con 10 millas recorridas. El precio de venta fue $54,500.00, más un contrato de servicio de $2,800.00, para un total de $57,300.00. que fue financiado a través de Villa Coop al 2.99% de interés, mediante ochenta y tres (83) pagos de $757.00 y un último pago de $744.32.

7. La querellante dejó en "trade in" un auto Lexus E8350 del 2016, con un balance adeudado a Toyota Credit de $27,579.12, por el cual el dealer le brindó un crédito de $26,000.00.

8. Al momento de la compraventa, la unidad Acura tenía vigente la garantía de fábrica, de tres (3) años o treinta y seis mil (36,000) millas, lo que ocurriese primero.

9. El 26 de diciembre de 2019, la querellante llevó la guagua al Centro de Servicio Acura, para ofrecerle el mantenimiento de las 3,000 millas, por lo cual se le

---

[5] *Íd.*, págs. 174-188.

reemplazó el aceite y filtro de motor, ajuste de precisión de aire de neumáticos e inspección de otros componentes y fluidos, según surge de la Orden de Servicio 767539. El millaje de la unidad era 3,063 millas.

10. El 3 de enero de 2020, la querellante llevó la unidad al Centro de Servicio Acura, porque presentaba "sonidos en el área del dash, como burbujitas explotando, lo hace todo el tiempo" conforme surge de la Orden de Servicio 767870. La querellante no la llevó a otro mecánico.

11. En el Centro de Servicio Acura realizaron una inspección de la unidad y a ese momento, se duplicó la condición descrita por la querellante, por lo que procedieron a realizar ajuste de la cablería por el área del radio. El vehículo entró y salió del centro de servicio con el mismo millaje: 3,686 millas, aunque en la Orden de Servicio se indica que se realizó "road test".

12. El 20 de febrero de 2020, la querellante llevó la unidad al Centro de Servicio Acura, para brindarle el mantenimiento de las 6,000 millas, el cual fue ofrecido por la querellada. A ese momento, había dejado de presentar el sonido en el "dash". Orden de Servicio 769999.

13. Como resultado de la pandemia del Covid 19, que inició en el año 2020, la querellante estuvo un tiempo sin utilizar la unidad, hasta que fue autorizada nuevamente a trabajar.

14. El 30 de junio de 2020, la querellante llevó la unidad al Centro de Servicio Acura, para el mantenimiento de las 9,000 millas, el cual fue realizado. La querellante volvía a reclamar el sonido en el área del "dash", "como explotando unas burbujitas todo el tiempo". Se realizó inspección de la unidad, confirmando la queja de la querellante. Orden de Servicio 773396.

15. A tenor con la Orden de Servicio 773396, en el Centro de Servicio Acura realizaron búsqueda en "In Honda", encontrando un "Service Bulletin" del 18 de junio de 2020, que describe los dos síntomas que presentaba la unidad de la querellante. El técnico entro al sistema de diagnóstico del radio para determinar las causas por las cuales la unidad falló. El millaje del vehículo era de10,800 millas.

16. El 14 de agosto de 2020, la querellante regresó al centro de servicio con el reclamo de "sonido en área del dash como explotando unas burbujitas todo el tiempo", según surge de la Orden de Servicio número 775288.

17. Luego de la aprobación del Departamento de Garantías, en el centro de servicio reemplazaron los conectores rojo y verde en el "infotainment module", en el amplificador y en tuner units. El millaje del vehículo era de 12,978 millas.

18. 18 El 3 de octubre de 2020, la querellante llevó la unidad para brindarle el mantenimiento de las 12,000 millas y el 29 de diciembre de 2020, para el mantenimiento de las 18,000 millas.

19. El 17 de marzo de 2021, la querellante fue al Centro de Servicio Acura con el reclamo de un "sonido en el área del dash como algo explotando todo el tiempo", conforme surge de la Orden de Servicio 784113. Reclamó, además, halones al acelerar y bajar una cuesta pequeña.

20. Con relación al ruido en el "dash", el centro de servicio realizó ajustes a los conectores de amplificador y planta. En cuanto a los halones, indicó que la unidad no presentó la condición. El vehículo entró y salió del centro de servicio con 24,338 millas, pero en la Orden de Servicio se indica que se realizó prueba de manejo. Se le brindó el mantenimiento de las 24,000 millas.

21. Luego de salir del centro de servicio, transcurridos unos diez minutos, la querellante volvió a escuchar el sonido en el "dash", por lo que se comunicó con la Sra. Dagmar Rodger, agente de servicio de Acura, quien le coordinó una cita para finales de marzo de 2021.

22. El 29 de marzo de 2021, la querellante llevó la unidad a la cita programada al Centro de Servicio Acura, informando, además, que el radio de la unidad se interrumpía y se apagaba al conducir, y que al grabar mensaje para enviar por medio de Carplay, no se escuchaba. El vehículo se quedó en el taller y la parte querellada facilitó un vehículo a la querellante.

23. Al otro día, el representante del Centro de Servicio Acura se comunicó con la querellante para indicarle que el sonido no se estaba manifestando, por la que le preguntó que, si autorizaba que el jefe de taller se llevara la guagua para su residencia; con el fin de detectar el sonido. La querellante lo autorizó.

24. Al día siguiente, mientras el jefe de taller llegaba al centro de servicio, el sonido se manifestó. A esos efectos, el centro de servicio realizó ajustes a los conectores de planta e "infotainment" y un "update" al sistema, según surge de la Orden. de Servicio 784541. El vehículo entró y salió del centro de servicio con 24,692 millas.

25. El vehículo de la querellante salió del centro de servicio el 31 de marzo de 2021. Luego de salir del taller, cerca de Plaza Las Américas, el ruido volvió a manifestarse, por lo que la querellante llama a la Sra. Dagmar Rodger y se lo informó.

26. En abril de 2021, la querellante recibió del fabricante un documento llamado "Extensión de Garantía: Conectores de la Red Bus MOST de la RDX 2019-2020". Una conexión suelta en la Red Bus Most estaba ocasionando un estallido a chasquido proveniente del sistema de altavoces, una pantalla en blanco a que no hay sonido en el sistema de audio. Se extendería la garantía en el Red Bus MOST, a seis (6) años a 74,000 millas, lo que ocurriese primero.

27. El 18 de mayo de 2021, la querellante acudió al Centro de Servicio Acura para el mantenimiento de las 27,000 millas, y reclamó que la unidad tenía una fuga de aceite de motor.

28. El centro de servicio verificó la unidad, encontrando fisura en la soldadura del filtro de aceite, el cual fue reemplazado, según la Orden de Servicio número 786644. El vehículo entró y salió del centro de servicio con 27,127 millas.

29. El 1 de junio de 2021, la querellante reclamó al Centro de Servicio Acura un "sonido en el área del dash como algo explotando" y que el radio no funcionaba. Se realizó inspección de la unidad, la cual duplicó la condición de sonido en el área del "dash". Se encontró código almacenado en el radio y daños internos en el "infotainment control unit", por lo que recomendó su reemplazo, conforme surge de la Orden de Servicio número 787265. Millaje: 27,819 millas.

30. El 5 de julio de 2021, la querellante reclama al Centro de Servicio Acura "sonido en el área del dash coma algo explotando". El centro de servicio solicitó autorización de reparación al fabricante y ordenó una pieza, la cual se indica en la Orden de Servicio 788787, que no había llegado. Se brindó mantenimiento de 30,000 millas. La unidad entró y salió con 30,187 millas.

31. El 27 de agosto de 2021, la querellante reclamó el sonido en el área del "dash", como algo explotando, según Orden de Servicio 791270. El centro de servicio inspeccionó la unidad, la cual duplicó la condición y encontró código almacenado en el radio. Procedió con el reemplazo del "infotainment control unit". Se realizó además, el mantenimiento de las 33,000 millas El millaje de la unidad era de 33,927 millas.

32. El 27 de octubre de 2021, la querellante volvió al Centro de Servicio. Acura a reclamar: "sonido al conducir y/o estar detenida la unidad, tiene un sonido como si fuese algo explotando en el dash"; que al presionar pedal de freno ocasiona chillido y un sonido al girar a ambos lados, como un "clack" en el área trasera de la unidad. Vehículo fue trabajado, bajo la Orden de Servicio número 794024.

33. El 17 de diciembre de 2021, la querellante reclamó "sonido al girar a ambos lados como un clack en el área trasera de la unidad". En el centro de servicio determinaron que el sonido provenía del "frame" del techo panorámico por desgaste prematuro, ocasionando que estrillase al manejar. Se autorizó el reemplazo del "frame" a tenor con la Orden de Servicio 796289.

34. Ese día, la querellante reclamó "sonido en el área del dash como algo explotando". Se realizó inspección de la unidad confirmando la queja de la querellante. A tenor con la Orden de Servicio 796289, se encontró Service Bulletin 20-031 y la causa del problema, consistente en pérdida de conexión en varios de los "bus networks", por problemas de fabricación. Se procedió con la reparación, según Orden de Servicio 796289. La unidad entró al centro de servicio el 17 de diciembre de 2021, con 41,709 millas y salió el 18 de diciembre de 2021, con 41,712 millas.

35. Surge de la Orden de Servicio 796289, que el fabricante emitió el Recall 21-029, mediante el cual se realizó la

actualización del sistema Front Control Box y Telematic Control Unit, que permitiera la continuación de las comunicaciones bajo la red disponible a febrero de 2022.

36. El 25 de febrero de 2022, la querellante reclamó al centro de servicio lo siguiente:

   1) sonido en área de dash como algo explotando;

   2) al cerrar el sunroof se queda medio abierto;

   3) sonido al cerrar con puerta como un chillido

   4) al estacionar en reversa en inclinación no permite hacer drive ni reversa, se cambia a parking;

   5) No funciona Carplay, ni Mapas

37. En cuanto al sonido en área del "dash", el centro indicó que no tenía códigos almacenados, ni presentó condición, al igual que al estacionar en reversa; En cuanto al sunroof, se realizó ajuste y se preparó un estimado para corregir condición de desgaste en el gozne derecho de la puerta del baúl. Con relación al Carplay, se realizó prueba con un teléfono e indica "Ok". Se realizó mantenimiento de las 45,000 millas, a tenor con la Orden de Servicio número 799061.

38. El 11 de abril de 2022, la querellante reclamó al centro de servicio: "sonido al cerrar la compuerta, como un chillido, sonido al girar el guía como un clack en área trasera y sonido como algo explotando en área del dash". En la Orden de Servicio 800995 de esa fecha, se indica que a unidad no duplicó la condición del sonido del "dash" y del "clack" en el área trasera del vehículo. Se brindó el mantenimiento de las 48,000 millas.

39. Luego del reemplazo del gozne, la querellante reclamó al centro de servicio que la compuerta del baúl estaba descuadrada. Se encontró la compuerta descuadrada y el taller reajustó la misma, conforme surge de la Orden de Servicio 801310 del 20 de abril de 2022.

40. El 25 de abril de 2022, la querellante informó al centro de servicio que "cristal del sun roof está descuadrado". Se revisó la unidad, se encontró descuadrado y se realizó ajuste al cristal y a tornillo, a tenor con Orden de Servicio número 801548. Unidad entró y salió del centro de servicio con 49,399 millas.

41. El 5 de mayo de 2022, la querellante reclamo "sonido al pasar carretera irregular en área del plafón y que la cámara de reversa se veía borrosa". Se realizó inspección de la unidad y se encontró sonido en área del techo al pasar por carretera irregular, ocasionado por el "deglector" [sic], según la Orden dé Servicio 801966. Se envió a garantía para evaluación del fabricante. En cuanto a la cámara en reversa, no presentó la condición.

42. El 25 de agosto de 2022, la querellante radicó la querella de autos ante el Departamento, solicitando como remedio la resolución del contrato de compraventa del vehículo.

43. El 9 de febrero de 2023, el Departamento llevó a cabo la inspección de la unidad por el técnico automotriz José F. Aponte Ortiz, quien rindió y notificó un informe, que fue objetado por la parte querellada, y en el que se consignó lo siguiente:

- Al momento de realizar la prueba de carretera el vehículo presenta ruido constante en el área del *sunroof*.

- Lo relacionado a la fuga de aceite, se indica por parte de la querellante que ya fue corregido.

- En el área del "Dash" no se pudo determinar ruido alegado en la querella proveniente de esta área.

- Se pudo percibir en algunas ocasiones un leve ruido "click" proveniente del pedal de frenos al este ser aplicado.

44. La opinión pericial del técnico automotriz de DACO fue la siguiente:

Con referencia al ruido que proviene del techo del vehículo, la constancia de este denota algún tipo de necesidad de ajuste en la maquinaria del "sunroof" y posiblemente en los paneles del interior que la rodean. Esto sin pasar por alto la necesidad de reemplazo de piezas por desgaste a desperfectos si así fuera especificado por el fabricante, luego de que se realice un procedimiento de investigación profunda de la procedencia del ruido, utilizando las herramientas, y literatura con especificaciones necesarias y aprobadas para estos efectos.

El "click" que se escuchó por éste que subscribe en el área del pedal de freno al aplicar el pedal del freno, valga la redundancia, aparenta ser el "brake switch" que va instalado en el pedal de freno. Este interruptor hace un leve "click" al momento de poner en movimiento su mecanismo interior. Al momento de realizada esta inspección, no se determina desperfecto con relación a esta condición que no sea el posible reemplazo del "brake switch", si se determinara que esté defectuoso luego de realizar un diagnóstico para estos efectos recomendado por el manufacturero.

En el "dash" al momento de realizada esta inspección, específicamente bajo la prueba de manejo por diferentes tipos de superficies irregulares en la carretera, no se detectó ruido fuera de lo normal proveniente de esta área.

45. En febrero de 2023, la unidad no encendió y presentó varios códigos en el panel de instrumentos, así como mensaje requiriendo servicio e indicando que no la moviera. El 15 de febrero de 2023, la querellante la llevó en grúa al centro de servicio, informando que la luz de "brake system" estaba encendida y que la unidad encendía vaga.

46. A tenor con la Orden de Servicio 813640, se verificó la unidad y se encontró la batería defectuosa, la cual se reemplazó, a un costo para la querellante de $395.68.

47. El 1 de abril de 2023, al conducir por la Carretera 10 en dirección a Adjuntas, la unidad dio un halón y luego se quedó sin fuerzas, y tenía varias luces encendidas en el panel CMBS, que se aguantaba al acelerar. La unidad llegó en grúa al centro de servicio desde Adjuntas. La querellante tuvo que ausentarse de una reunión de trabajo que tenía a las 10:00 a.m. A ese momento, la unidad tenía 66,942 millas recorridas, según la Orden de Servicio 814216.

48. El Centro de Servicio Acura verificó la unidad y encontró el Código P0087 - Fuel Rail Pressure Too Low. Se procedió a reemplazar la bomba de gasolina, corrigiendo la condición. Le facilitaron un carro a la querellante, ya que su unidad estuvo unas dos semanas en el taller.

49. Para el mes de julio de 2023, la querellante recibió del fabricante una "Extensión de Garantía", por error de comunicación en la Red Bus Most de la RDX 2019-2020. Ello, debido a que no se fabricó un terminal de cable coaxial con las especificaciones adecuadas, resultando en una comunicación deficiente de la Red Bust MOST, lo que afecta a calidad del sonido del audio. A esos efectos, se extiende la cobertura de la garantía de los cables de servicio FAKRA y de la Red Bus MOST, a ocho (8) años a 100,000 millas, lo que ocurra primero.

50. El mismo día de la vista administrativa, de camino al Departamento, el sonido en el "dash" volvió a manifestarse, y no estaba funcionando el sistema de navegación (GPS), lo cual es un instrumento sumamente importante para el trabajo que realiza la querellante.

51. Para la querellante, el ruido es uno constante e incómodo, que le causa inseguridad al no conocer la causa del mismo. La querellante teme por su seguridad y en ocasiones, ha tenido que detenerse en la carretera, para verificar la causa del ruido, antes de continuar la marcha.

52. La querellante está al día en los pagos mensuales de $757.00 a la Cooperativa de Ahorro y Crédito Villa Coop Agustín Burgos Rivera y nunca ha dejado de realizar los pagos a la entidad financiera. La parte querellante no notificó a la cooperativa sobre la condición defectuosa del vehículo según requerido por la Ley Núm. 68 de 19 de junio de 1964, según enmendada.

53. Aunque el vehículo es para su uso personal, también es el medio que la querellante utiliza para llegar a sus reuniones de trabajo. La querellante veía su trabajo interrumpido por las muchas ocasiones en que tenía que ir al centro de servicio.

54. La querellante adquirió la unidad motivada para la seguridad que le brindaba una guagua, y por el hecho de que, en ocasiones, salía tarde de sus reuniones de trabajo, y tenía que transitar en horas de la noche.

55. La querellante compró una unidad nueva para atender sus compromisos de trabajo y tener certeza de que no

se verían afectados con fallas mecánicas, como ocurrió el 1 de abril de 2023.[6]

Considerados tales elementos fácticos, el DACo concluyó que pese a las continuas gestiones de la querellante, el representante de fábrica no identificó ni corrigió la condición alegada dentro de un término razonable. En vista de lo anterior, dispuso que procedía la resolución del contrato de compraventa. Consecuentemente, ordenó el reembolso de los pagos emitidos a favor de la Cooperativa de Ahorro y Crédito Villa Coop en concepto del financiamiento del automóvil, así como el relevo de los próximos pagos.

Oportunamente, el 8 de diciembre de 2023, Bella International sometió una *Moción de Reconsideración y Señalamientos de Errores*.[7] En lo pertinente, adujo que el DACo abusó de su discreción al obviar la evidencia corroborada por el historial de servicios. En particular, aseveró que descartó prueba objetiva y corroborada, que demostró que el vehículo objeto del litigio había sido reparado. También, indicó que no procedía la imposición de honorarios, pues el ente administrativo nunca emitió una determinación de temeridad. Agregó que no obra en el expediente evidencia que sostenga tal conclusión. Transcurrido el término dispuesto para atender tales argumentos, el DACo rechazó de plano la solicitud de reconsideración.

Inconforme, el 22 de enero de 2024, Bella International acudió ante nos mediante un *Recurso de Revisión Judicial*. En su solicitud, expuso los siguientes señalamientos de error:

> **PRIMER ERROR**: Erró el Honorable Departamento al concluir que la prueba presentada durante la vista administrativa estableció que la condición del ruido en el "dash" no fue corregida por Bella.

---

[6] *Íd.*, págs. 176-181.
[7] *Íd.*, págs. 202-212.

**SEGUNDO ERROR:** Erró el Honorable Departamento al determinar que tenía jurisdicción para atender las controversias del presente caso, a pesar del Vehículo Objeto ser uno de uso de explotación comercial.

**TERCER ERROR:** Erró el Honorable Departamento al imponer a Bella el pago de una cantidad de $1,500.00 por concepto de honorarios, aun cuando nunca hizo una determinación de temeridad.

Presentado el recurso de epígrafe, el 1 de febrero de 2024, este Tribunal de Apelaciones emitió *Resolución* en la cual ordenó a Bella International a tramitar la regrabación de los procedimientos administrativos dentro de los próximos diez (10) días. También, decretamos someter la transcripción de la prueba estipulada dentro del término de treinta (30) días a partir de la entrega de la aludida regrabación.

Tras una serie de extensiones de término, cuyo trámite procesal es innecesarios de pormenorizar, el 24 de junio de 2024, la parte recurrente sometió una *Moción en Cumplimiento de Orden y Sometiendo Transcripción de los Procedimientos*. Evaluado lo anterior, el 26 de junio de 2024, esta Curia emitió *Resolución* en la cual concedió a la parte recurrida diez (10) para presentar sus objeciones relativas a la prueba oral estipulada.

Así dispuesto, el 2 de julio de 2024, la querellante recurrida presentó una *Moción en Cumplimiento de Orden*, en la cual expuso que no tenía objeciones respecto a la transcripción sometida. En vista de ello, el 3 de julio de 2024, este foro apelativo emitió *Resolución* ordenando a Bella Internacional a presentar su alegato suplementario dentro de treinta (30) días a partir de la notificación del dictamen. A su vez, decretamos que la señora Maisonet Rodríguez sometiera su respectiva oposición al recurso dentro del término de treinta (30) días a partir de la presentación del alegato suplementario o transcurrido dicho término.

En cumplimento con lo ordenado, el 6 de septiembre de 2024, la señora Maisonet Rodríguez presentó el *Alegato en Oposición al Recurso de Revisión*. Con el beneficio de la comparecencia de ambas partes, procedemos a discutir el marco legal pertinente a la controversia ante nuestra consideración.

**II.**

### A. Estándar de revisión judicial de las determinaciones administrativas

Es norma reiterada que los tribunales revisores apelativos están llamados a conceder amplia deferencia a las decisiones de las agencias administrativas. *Otero Rivera v. Bella Retail Group, Inc.* 2024 TSPR 70, 213 DPR ___ (2024); *Oficina del Comisionado de Seguros de Puerto Rico v. Point Guard Insurance Company, Inc.*, 205 DPR 1005, 1026 (2020). Tales determinaciones gozan de experiencia y conocimiento especializado sobre los asuntos ante su consideración. *Oficina de Ética Gubernamental v. Martínez Giraud*, 210 DPR 79, 88 (2022); *Capó Cruz v. Junta Planificación et al.*, 204 DPR 581, 591 (2020).

Respecto a las determinaciones de hechos agenciales, los tribunales no intervendremos en estas, siempre y cuando surja del expediente administrativo evidencia sustancial que las respalda. *The Sembler Co. v. Mun. De Carolina,* 185 DPR 800, 821-822 (2012). La evidencia sustancial es aquella prueba relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. *Capó Cruz v. Jta. de Planificación et al., supra.* 591.

No obstante, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, *Ley Núm. 38-2017, 3 LPRA sec. 9675*, según enmendada, dispone que "[l]as conclusiones de derecho serán revisables en todos sus aspectos".

Cuando de conclusiones de derecho se trata, tenemos una amplia facultad de revisarlas completa y absolutamente. *IFCO Recycling v. Aut. Desp. Sólidos,* 184 DPR 712, 745 (2012); *Assoc. Ins. Agencies, Inc. v. Com. Seg.* P.R., 144 DPR 425, 436 (1997). Lo anterior, sin embargo, "no equivale a la sustitución automática del criterio e interpretación del organismo administrativo". *Capó Cruz v. Junta de Planificación, supra,* pág. 591; *Rolón Martínez v. Caldero López,* 201 DPR 26, 36 (2018).

Ahora bien, la deferencia a las determinaciones agenciales no es infinita. No podemos imprimir un sello de corrección a las determinaciones o las interpretaciones administrativas irrazonables, ilegales o contrarias a derecho. *Super Asphalt Pavement, Corp. v. Autoridad para el Financiamiento de la Infraestructura de Puerto Rico,* 206 DPR 803, 819 (2021). Nuestra deferencia cede cuando: **(1) la decisión no está basada en evidencia sustancial;** (2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o reglamentos; (3) ha mediado una actuación arbitraria, irrazonable o ilegal, o (4) la actuación administrativa lesiona derechos constitucionales fundamentales. *Capote Rivera v. Voili Voila Corporation,* 2024 TSPR 29, 213 DPR ___ (2024); *Super Asphalt Pavement, Corp. v. AFI y otro, supra,* pág. 819. No obstante, la determinación de una agencia merece deferencia sustancial aun cuando su interpretación no sea la única razonable. *Torres Santiago v. Depto. Justicia,* 181 DPR 969, 1003 (2011). Solo es posible sustituir "el criterio de la agencia por el del tribunal revisor cuando no exista una base racional para explicar la decisión administrativa". *Capote Rivera v. Voili Voila Corporation, supra; Capó Cruz v. Jta. de Planificación et al, supra,* pág. 591.

**B. Impugnación de la apreciación de la prueba el contexto administrativo**

Como norma general, la cuestión de apreciación y credibilidad de una agencia merece nuestra deferencia. *Otero v. Toyota,* 163 DPR 716, 732 (2005). Por tal razón, la parte que refute judicialmente las determinaciones de hechos tiene el peso prueba para demostrar que no están basadas en el expediente o que las conclusiones a las que llegó la agencia son irrazonables. *Oficina de Ética Gubernamental v. Martínez Giraud, supra,* pág. 89. **Debe establecer que existe otra prueba evidencia en el expediente que reduce o menoscaba el valor probatorio hasta tal punto que no sea posible concluir que la determinación recurrida fue una razonable de acuerdo con la totalidad de la prueba presentada ante la agencia**. J. Echevarría Vargas, *Derecho Administrativo Puertorriqueño*, 5ta ed. rev., San Juan, Ed. SITUM, 2023, pág. 232. (Énfasis nuestro).

El Tribunal Supremo de Puerto Rico favorece esta normativa bajo el siguiente fundamento:

> [A]l ejercer la revisión judicial los tribunales no pueden descartar de forma absoluta la determinación de una agencia, sino que primero tienen que examinar la totalidad del expediente y determinar si la interpretación de la agencia representó un ejercicio razonable de su discreción administrativa, así fundamentado en la pericia particular de esta, en consideraciones de política pública o en la apreciación de la prueba. *Capote Rivera v. Voili Voila Corporation, supra.*

Por tanto, nos corresponde respetar la evaluación de credibilidad de la agencia, pues solo tenemos ante nos los récords mudos e inexpresivos. J. Echevarría Vargas, *Derecho Administrativo Puertorriqueño, supra*, pág. 342, citando a *Camacho Torres v. Adm. para el Adiestramiento de Futuros,* 168 DPR 66 (2006).

### C. *Evaluación de la prueba pericial*

La Regla 703 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 703, establece los siguiente en torno a los peritos:

> (a) Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita.
>
> (b) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio.
>
> (c) La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

El Tribunal Supremo de Puerto Rico precisa que "[u]n perito es una persona que, a través de la educación o experiencia, ha desarrollado un conocimiento o destreza sobre una materia de manera que puede formar una opinión que sirva de ayuda al juzgador". *S.L.G. v. Mini-Warehouse*, 179 DPR 322, 338 (2010), citando a *Black's Law Dictionary*, 8va ed., Minnesota, Ed. Thomson West, 2004, pág. 619. Como cualquier otro testigo, su función es dar a conocer la verdad derivada de su conocimiento especializado. *Rivera Gómez v. Arcos Dorados Puerto Rico, Inc.*, 212 DPR 194, 207 (2023).

El testigo perito brinda su ayuda al juzgador en el proceso de adjudicación de una controversia, por lo que, la determinación de su calificación debe producirse mediante un ponderado y juicioso ejercicio de discreción por parte de dicho juzgador. *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273, 293 (2006). La carencia de determinada especialidad afecta el peso de la prueba pericial pero no incide en su cualificación del perito. *Íd.*, pág. 295. Más

bien, la consideración de tal carencia tiene relevancia en la apreciación del valor probatorio de su declaración. *Íd.*

Así pues, el valor probatorio del testimonio pericial depende del análisis de determinados factores, tales como: **(1) si el testimonio está basado en hechos o información suficiente**; **(2) si el testimonio es el producto de principios y métodos confiables; (**3**) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso; (4) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica; (5) las calificaciones o credenciales de la persona testigo, y (6) la parcialidad de la persona testigo**. *S.L.G. v. Mini-Warehouse, supra,* pág. 344. Véase, también, *Dye-Tex Puerto Rico, Inc. v. Royal Ins. Co. of Puerto Rico, Inc.*, 150 DPR 658 (2000). (Énfasis nuestro).

Este análisis probatorio está sujeto a la apreciación que emita el juzgador de los hechos, lo cual, como norma general, merece nuestra deferencia. No obstante, en cuanto a la prueba pericial puntualizamos que no estamos obligados a seguir indefectiblemente la opinión, el juicio, la conclusión o la determinación de un foro adjudicativo, pues estamos en plena libertad de adoptar nuestro criterio propio en la apreciación o la evaluación de la prueba pericial e incluso podemos descartar la misma aunque resulte ser técnicamente correcta. *Culebra Enterprises Corp. v. ELA,* 143 DPR 935, 952 (1997). Igual norma aplica a la evaluación de prueba documental en cuyo caso estamos en idéntica posición que el juzgador de los hechos. *Trinidad v. Chade,* 153 DPR 280, 292 (2001).

### D. Facultades adjudicativas del Departamento de Asuntos del Consumidor

La Ley Orgánica del Departamento de Asuntos del Consumidor, Ley Núm. 5 del 23 de abril de 1973, 3 LPRA sec. 341, según enmendada, faculta a la agencia a "adjudicar las querellas que se traigan ante su consideración y conceder los remedios pertinentes conforme a derecho". 3 LPRA sec. 341e(d). Véanse, además, *Ortiz Rolón v. Armando Soler Auto Sales, Inc.,* 202 DPR 689, 696 (2019); *Amieiro González v. Pinnacle Real Estate Home Team,* 173 DPR 363, 372 (2008). El DACo tiene el deber de velar por el cumplimiento de todas las leyes relacionadas con los derechos de los consumidores. 3 LPRA sec. 341e(d).

A esos fines, el Artículo 6 de la Ley Núm. 5, *supra,* establece los poderes delegados al referido organismo administrativo:

> (c) Atender, investigar y resolver las quejas y querellas presentadas por los consumidores de bienes y servicios adquiridos o recibidos del sector privado de la economía. Cuando declare con lugar una querella, el Secretario ordenará al querellado perdidoso que haya procedido con temeridad que pague total o parcialmente los gastos incurridos por el Departamento en su tramitación. El Secretario dispondrá por reglamento los cargos por concepto de gastos que deberá pagar el querellado perdidoso.
>
> (d) Poner en vigor, implementar y vindicar los derechos de los consumidores, tal como están contenidos en todas las leyes vigentes, a través de una estructura de adjudicación administrativa con plenos poderes para adjudicar las querellas que se traigan ante su consideración y conceder los remedios aptos conforme a derecho, disponiéndose que las facultades conferidas en este inciso podrá delegarlas el Secretario en aquel funcionario que él entienda cualificado para ejercer dichas funciones. 3 LPRA sec. 341e.

También, tiene el deber de "establecer las reglas y normas necesarias para la conducción de los procedimientos administrativos, tanto de reglamentación como de adjudicación, que celebre el Departamento". 3 LPRA sec. 341e.

En cumplimiento con la referida ley, el DACo adoptó el Reglamento de Procedimientos Adjudicativos, Reglamento 8034, 13 de junio de 2011 (Reglamento 8034). Dicho cuerpo regulador favorece la solución justa, rápida y económica de las querellas presentadas ante el Departamento y provee un procedimiento uniforme. Regla 1, Reglamento 8034. Su aplicabilidad se extiende a "las investigaciones y los procedimientos administrativos sobre querellas iniciadas por consumidores, o por el Departamento". Regla 3, Reglamento 8034. De igual modo, estas reglas aplican a los procesos adjudicativos impuestos por nueva legislación, exceptuando los términos para llevar a cabo el proceso adjudicativo cuando alguna ley establece términos distintos, los cuales el Departamento debe adoptar. *Íd.*

En lo concerniente, la Regla 4(f) establece que consumidor es "[t]oda persona natural, que adquiere o utiliza productor o servicios como destinatario final". Regla 4(f), Reglamento 8034. Tal conceptualización resulta acorde con la Regla 4(u), la cual especifica que un querellante es el "[c]onsumidor o representante autorizado que reclama un derecho o servicio en su capacidad personal". Regla 4(u), Reglamento 8034.

Un consumidor que exhiba los elementos discutidos ostenta la facultad para presentar ante el DACo una querella. Por su parte, la Regla 4(t) define *Querella* de la siguiente manera:

> Reclamación presentada por un consumidor o su representante autorizado solicitando que le sea reconocido un derecho y concedido un remedio. En adición, es una acción iniciada por el Departamento, para hacer cumplir las leyes y reglamentos, e imponer multas o sanciones. Regla 4(t), Reglamento 8034, *supra.*

El precitado reglamento instaura este procedimiento de la siguiente manera:

> Toda querella se inicia y consulta del querellante o del personal del Departamento, donde se expresan los hechos

que motivan la reclamación. El Departamento asesorará al querellante sobre los documentos necesarios para radicar la querella. Regla 5.1, Reglamento 8034, *supra.*

Instada una reclamación con tales componentes, procede celebrar una vista ante el foro agencial. En dicho procedimiento es permisible la presentación de material probatorio:

> Las partes podrán presentar aquella evidencia documental y testifical incluyendo evidencia de carácter técnico y pericial. El oficial examinador, el Juez Administrativo, Secretario o Panel de Jueces, podrán tomar conocimiento administrativo, a iniciativa propia o a solicitud de parte, sobre aquellos hechos o circunstancias de interés público que son conocidas por todas las personas bien informadas; o que son susceptibles de determinación inmediata y exacta recurriendo a fuentes cuya exactitud no puede ser razonablemente cuestionada. Regla 20.5 de Reglamento 8034.

La Regla 24 del Reglamento 8034, *supra*, preceptúa que la aplicabilidad de las normas probatorias no constituye una medida estricta:

> **Las Reglas de Procedimiento Civil y de Evidencian no serán de estricta aplicación a las vistas administrativas, sino en la medida en que el Funcionario o Panel de Jueces que presida la vista o el Departamento estime necesario para llevar a cabo los fines de la justicia**. (Énfasis nuestro).

Celebrada la vista administrativa, el Juez Administrativo estará en posición de emitir una resolución que exhiba los siguientes elementos:

> La resolución de la querella en sus méritos contendrá una relación de la determinación de hechos probados, la cual se ajustará y tendrá apoyo en el expediente del procedimiento, conclusiones de derecho, y dispondrá lo que en Derecho proceda para su ejecución mediante una orden e incluirá los apercibimientos para solicitar revisión judicial. Regla 26.1, Reglamento 8034, *supra.*

La determinación agencial deberá estar respaldada en evidencia sustancial, es decir, "evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". Regla 4(i), Reglamento 8034, *supra.* Incluirá, a su vez, la concesión de remedios correspondientes:

> Toda resolución otorgará el remedio que en derecho proceda aun cuando la parte querellante no lo haya

solicitado. Cuando el remedio otorgado sea una orden de hacer o cumplir con un acto determinador deberá contener, (1) cuando surja del expediente o (2) cuando se pueda tener conocimiento administrativo, el importe o valor monetario de la orden, para que en la alternativa de no cumplir con la misma, la parte obligada compense monetariamente. Regla 27.1, Reglamento 8034, *supra.*

A su vez, se "podrá imponer a la parte perdidosa el pago de costas y honorarios de abogados". Regla 27.3, Reglamento 8034.

### E. Servicio de garantía en el contexto de la compraventa vehículos de motor

La Ley de Garantías de Vehículos de Motor, Ley Núm. 7 de 24 de septiembre de 1979, 10 LPRA sec. 2051, según enmendada, procura la seguridad, la salud y la bienestar de la comunidad al evitar que vehículos de motor defectuosos y de gran potencialidad de daños transiten por nuestras vías públicas. El Artículo 3 de esta pieza legislativa recoge su objetivo de la siguiente manera:

> Es el propósito primordial de esta Ley proteger al consumidor de vehículos de motor nuevos de Puerto Rico, asegurándole que los vehículos de motor que adquiere han de tener las mismas garantías de fábrica que el fabricante o manufacturero otorga a estos vehículos de motor en los Estados Unidos continentales, y será siempre la que resulte mayor al alcance y amplitud en sus beneficios, independientemente del lugar donde el consumidor adquiera el vehículo, de la persona de quien el consumidor adquiera el mismo y de que el fabricante o manufacturero brinde el servicio de garantía de fábrica en un lugar de Puerto Rico. Es, igualmente, el propósito de esta ley, velar por que los intereses de los consumidores sean salvaguardados frente a los intereses del manufacturero y el distribuidor o vendedor, según se definen estos términos en esta Ley. 10 LPRA sec. 2053.

Cónsono con lo anterior, esta ley dispone que "[e]s necesario asegurar al consumidor de vehículos de motor que ese producto sirva a los propósitos para los cuales lo adquirió y que reúna las garantías mínimas necesarias en protección de su vida y propiedad". Exposición de Motivos de la Ley de Garantías de Vehículos de Motor, *supra.* Por tal razón, establece que **"[l]a garantía de fábrica es una obligación contractual escrita que el fabricante o manufacturero voluntariamente asume para**

**con el consumidor**". *Íd.* (Énfasis nuestro). El distribuidor autorizado o independiente, o el vendedor que entregue a un consumidor un vehículo de motor nuevo vendrá obligado a prestar efectivamente los servicios de garantía de fábrica. 10 LPRA sec. 2061.

En la consecución de esta obligación, el DACo tendrá la facultad para adoptar las reglas y los reglamentos que estime necesarios. 10 LPRA sec. 2063. A esos fines, el 6 de junio de 2006, el DACo adoptó el Reglamento de Garantías de Motor, Reglamento 7159.[8] Este cuerpo normativo delimita sus propósitos de la siguiente manera:

> (a) Proteger adecuadamente a los consumidores y sus inversiones en la adquisición del vehículo de motor.
>
> **(b) Procurar que todo consumidor que compre un vehículo de motor en Puerto Rico, le sirva para los propósitos que fue adquirido, y que reúna las condiciones mínimas para garantizar la protección de su vida y propiedad**.
>
> (c) Prevenir las prácticas ilícitas en la venta de vehículos de motor en Puerto Rico. Regla 2, Reglamento 7159, *supra*. (Énfasis nuestro).

Por su parte, la Regla 22 del precitado reglamento establece la facultad que tiene el DACo para ordenar la resolución del contrato en el siguiente contexto:

> El Departamento podrá, a opción del comprador, decretar la resolución del contrato o reducir proporcionalmente el precio de venta de acuerdo con el Código Civil de Puerto Rico, en aquellos casos en que el vendedor, distribuidor autorizado o concesionario, distribuidor de fábrica, tuvo oportunidad razonable para reparar uno o más defecto, pero no quiso o no pudo corregirlos. Lo que constituye oportunidad razonable para reparar se determinará tomando en consideración las circunstancias particulares de cada caso. Regla 22, Reglamento 7159, *supra*.

Por último, la Regla 37 del Reglamento 7159, *supra*, dispone que:

---

[8] El 3 de septiembre de 2010, el DACo aprobó el Reglamento 7920 intitulado Enmiendas al Reglamento sobre Garantías de Vehículo de Motor. No obstante, las disposiciones reglamentarias aplicables a esta controversia permanecen inalteradas.

> Nada de lo dispuesto en este Reglamento limitará en forma alguna el derecho del consumidor a ejercer cualquier acción que le reconozcan las leyes generales o especiales del Estado Libre Asociado de Puerto Rico, así como las acciones de saneamiento por evicción, saneamiento por vicios ocultos o redhibitoria y cualquiera otras que reconozca el Código Civil de Puerto Rico.

De acuerdo con el Tribunal Supremo de Puerto Rico, las determinaciones de DACo relacionadas con estos asuntos deben estar en armonía con las disposiciones pertinentes del Código Civil y su jurisprudencia interpretativa. *Rodríguez Dilán v. Guacoso Auto Corp.*, 166 DPR 433, 439 (2005). En virtud de lo anterior, la agencia "debe evaluar las acciones de saneamiento presentadas ante sí, ya sea por evicción o vicios ocultos, conforme al Código Civil y su jurisprudencia, a las leyes especiales y a sus propios reglamentos". *Íd.*

### F. Vicios ocultos en el contexto de compraventa de vehículo de motor

El Artículo 1334 del Código Civil de la Ley Núm. 48 de 28 de abril de 1930, 31 LPRA sec. 3801, según enmendada, dispone que en el contrato de compraventa uno de los otorgante se obliga entregar una cosa determinada, y el otro a pagar por ella por un precio cierto, en dinero o signo que represente.[9] Mediante este tipo de contrato "[e]l vendedor está obligado a la entrega y saneamiento de la cosa objeto de la venta". 31 LPRA sec. 3838. **Lo anterior implica que responderá al comprador de los vicios o los defectos ocultos que tuviere**. 31 LPRA sec. 3831. Véase, también, *Rodríguez Dilan v. Guacoso Auto Corp.*, *supra*, pág. 439. (Énfasis nuestro).

---

[9] Nuestro Poder Legislativo derogó el Código Civil de 1930 mediante la aprobación de la Ley Núm. 55 de 1 de junio de 2020, según enmendada, mejor conocida como Código Civil de 2020, 31 LPRA sec. 5311. **No obstante, puntualizamos que los hechos que dan lugar a la presente reclamación surgen previo a la aprobación del Código Civil de 2020. En vista de lo anterior, aplicaremos las disposiciones del derogado Código Civil de 1930.**

El Artículo 1373 del Código Civil dispone la norma atinente a los casos de saneamientos por defectos o gravámenes ocultos:

> El vendedor estará obligado al saneamiento por los defectos ocultos que tuviere la cosa vendida, si la hacen impropia para el uso a que se la destina o si disminuyen de tal modo este uso que, de haberlos conocido el comprador, no la habría adquirido o habría dado menos precio por ella; pero no será responsable de los defectos manifiestos o que estuvieren a la vista, ni tampoco de los que no lo estén, si el comprador es un perito que, por razón de su oficio o profesión, debía fácilmente conocerlos. 31 LPRA sec. 3841.

De conformidad con lo anterior, el saneamiento por vicios ocultos contempla aquellas situaciones en las que posterior a la entrega se evidencian defectos intrínsecos que exceden las imperfecciones menores que cabe esperar normalmente en un producto determinado. *Polanco v. Cacique Motors*, 165 DPR 156, 166 (2005).

Sobre este particular, el Tribunal Supremo de Puerto Rico desglosa las condiciones requeridas para que prospere una acción de saneamiento por vicios ocultos:

> (1) no deben ser conocidos por el adquirente; (2) el defecto debe ser grave o suficientemente importante para hacer la cosa impropia para el uso a que se le destina o que disminuya de tal modo este uso que, de haberlo conocido el comprador, no la habría comprado o habría dado menos precio por ella; (3) que sea preexistente a la venta, y (4) que se ejercite la acción en el plazo legal, que es el de seis meses contados desde la entrega de la cosa vendida. *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 890-891.

A su vez, el precitado caso identifica el criterio de los vicios redhibitorios como "aquellos defectos que exceden de las imperfecciones menores que cabe esperar normalmente en un producto determinado, no siendo necesario que dichos defectos imposibiliten el uso de la cosa vendida, siempre que mermen notablemente su valor". *Íd.*, pág. 891.

En cuanto a la venta de vehículos de motor, el deber de garantía es conocido como saneamiento por evicción y vicios ocultos. *Domínguez v. Caguas Expressway Motors, Inc.*, 148 DPR

387, 395 (1999). La jurisprudencia establece que solamente compete al comprador probar que el automóvil que compró no funcionaba en forma normal y que el vendedor tuvo oportunidad de corregir los defectos y no pudo o no los corrigió. *García Reyes v. Cruz Auto Corp.*, *supra*, pág. 891. En tal contexto, "**el comprador no perito solo está obligado a demostrar que al momento de la compraventa el automóvil funcionaba normalmente, y que el vendedor no quiso o no pudo corregir el defecto a pesar de haber tenido la oportunidad de hacerlo**". *Polanco v. Cacique Motors*, *supra*, pág. 168. (Énfasis nuestro).

### G. *Honorarios de abogados por temeridad*

La Sección 3.21(c) de la Ley de Procedimiento Administrativo Uniforme, *supra*, 3 LPRA sec. 9661, establece que la agencia en su función cuasi judicial podrá imponer honorarios de abogados de conformidad con la Regla 44 de Procedimiento Civil, según enmendada.[10] La aludida regla procesal dispone que en caso de que cualquier parte o su abogado proceda con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. 32 LPRA Ap. V, R. 44.1(d).

En términos generales, el amplio concepto de temeridad contempla aquellas actuaciones de un litigante que generen un pleito que pudo evitarse, que provoquen la prolongación indebida del trámite judicial y que obligue a la otra parte a incurrir en gastos innecesarios para hacer valer sus derechos. *González Ramos v. Pacheco Romero*, 209 DPR 138, 148 (2022). Un litigante perdidoso actúa con temeridad cuando por su terquedad,

---

[10] Regla 44 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1(d).

testarudez, obstinación, contumacia, empecinamiento, impertinencia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte a asumir innecesariamente las molestias, los gastos e inconvenientes de un pleito. *Íd.*, págs. 148-149.

Al imponer honorarios de abogado a la parte temeraria, es necesario considerar: (1) el grado de temeridad; (2) el trabajo realizado; (3) la duración y naturaleza del litigio; (4) la cuantía involucrada, y (5) el nivel profesional de los abogados. C.*O.P.R. v. S.P.U.*, 181 DPR 299, 342-343 (2011), citando a R. Hernández Colón, *Derecho Procesal Civil*, San Juan, Ed. LexisNexis, 2010, Sec. 4402. **Cuando se condena a la parte perdidosa a pagar honorarios de abogado, lo que se puede hacer en todo tipo de acción,** "**tal imposición constituye una determinación implícita de temeridad**". *González Ramos v. Pacheco Romero*, *supra*, pág. 148. (Énfasis nuestro).

A manera de ilustración, el Tribunal Supremo de Puerto Rico identifica las siguientes instancias constitutivas de temeridad:

> (1) contestar una demanda y negar responsabilidad total, aunque se acepte posteriormente; (2) defenderse injustificadamente de la acción; (3) creer que la cantidad reclamada es exagerada y que sea esa la única razón que se tiene para oponerse a las peticiones del demandante sin admitir francamente su responsabilidad, pudiendo limitar la controversia a la fijación de la cuantía a ser concedida; (4) arriesgarse a litigar un caso del que se desprendía prima facie su responsabilidad, y (5) negar un hecho que le conste es cierto a quien hace la alegación. C.*O.P.R. v. S.P.U.*, *supra*, pág. 342.

No obstante, la imposición del pago de honorarios por temeridad no procede cuando lo que se enuncia son controversias complejas y novedosas no resueltas; cuando se actúa acorde con una apreciación errónea del derecho y no hay precedentes establecidos sobre el asunto, o cuando existe alguna discrepancia

genuina en cuanto a quién favorece el derecho aplicable. *VS PR, LLC v. Drift-Wind, Inc.*, 207 DPR 253, 277 (2021); *Santiago v. Sup. Grande*, 166 DPR 796, 821 (2006). La evaluación de este asunto descansa en la discreción del juzgador, sin embargo, si entiende que la parte actuó temerariamente, la imposición de honorarios de abogados es mandatoria. *Pérez Rodríguez v. López Rodríguez*, 210 DPR 163, 193 (2022); *P.R. Oil v. Dayco*, 164 DPR 486, 511 (2005).

### III.

En el recurso de epígrafe, Bella International señala que el DACo actuó sin jurisdicción al atender la *Querella* instada por la señora Maisonet Rodríguez. En particular, alega que la querellante utiliza su vehículo de motor para fines de explotación comercial, lo que implica que no es una consumidora a tenor con el reglamento administrativo. En vista de ello, razona que el organismo administrativo debió desestimar la causa de acción.

Respecto a la controversia medular, la entidad recurrente aduce que la agencia incidió al concluir que no corrigió la condición del ruido. Argumenta que tal determinación fáctica no se encuentra respaldada en la prueba objetiva desfilada en la vista administrativa. A su vez, contiende que la querellante descansó en su testimonio oral para demostrar el alegado desperfecto. Sostiene, además, que su perito no cuenta con el conocimiento especializado, por lo que, su testimonio, no merece deferencia. Por último, alega que no existen los elementos para concluir que actuó con temeridad. En esa dirección, agrega que la agencia recurrida no emitió una determinación al respecto. Por lo que, sostiene que no procede la imposición de honorarios en

tal concepto. Así expuesto, solicita la revocación de la *Resolución* recurrida.

En respuesta a tales alegaciones, la señora Maisonet Rodríguez señala que la agencia actuó dentro de los límites de su jurisdicción. En ese sentido, asevera que utilizaba su vehículo de motor para desplazarse a su trabajo. Por lo que, considera que no procede aplicar las normativas recogidas en la *Interpretación del Secretario del DACo 2006-03* y las resoluciones agenciales que obran en el recurso. Sostiene que estas disposiciones resultan opuestas a los hechos en controversia. Según expone la recurrente, estas fuentes abordan situaciones relacionadas con aquellos vehículos registrados ante el Departamento de Transportación y Obras Públicas, los cuales suelen ser utilizados para carga, es decir, explotación comercial.

En torno a la controversia sobre incumplimiento del servicio de garantía, alega que en múltiples ocasiones manifestó a la corporación querellada su inquietud sobre el ruido. Sin embargo, asegura que nunca corrigió tal desperfecto. A esos fines, precisa que el informe pericial recoge la persistencia del "incesante y exasperante ruido".[11] En vista de ello, argumentó que el DACo arribó a una decisión correcta, la cual no se aparta de los procedimientos administrativos dispuestos en ley. A la luz de estas circunstancias, razonó que la representación legal de Bella International desplegó una conducta temeraria, entiéndase, un proceder "equivalente a terquedad, contumacia, empecinamiento en afincarse en una posición absurda e irresponsable".[12]

Examinado sosegadamente el recurso ante nuestra consideración, determinamos que el DACo emitió una *Resolución*

---

[11] *Alegato en Oposición a Recurso de Revisión,* pág. 16.
[12] *Íd.*, pág. 20.

respaldada en la totalidad del expediente administrativo. **El dictamen impugnado es cónsono al derecho vigente, por lo que, merece amplia deferencia de nuestra parte. Por estar estrechamente relacionados los señalamientos error, pasamos a resolverlos de manera conjunta.** (Énfasis nuestro).

En el caso que nos ocupa, Bella International levanta un cuestionamiento sobre ausencia de jurisdicción ante el DACo. La normativa procesal nos exige atender este argumento en primer lugar. Véanse, *R&B Power, Inc. v. Junta de Subastas*, 2024 TSPR 24, 214 DPR __ (2024); *Torres Alvarado v. Maderas Atiles*, 202 DPR 495, 500 (2019). En torno a la jurisdicción, la Ley Orgánica del Departamento de Asuntos del Consumidor, *supra*, establece que la referida agencia ostenta la facultad para resolver las querellas presentadas por los consumidores sobre los bienes y los servicios adquiridos. Por su parte, la Regla 4(f) del Reglamento 8034, *supra*, especifica que un consumidor es "[t]oda persona natural, que adquiere o utiliza productor o servicios como destinatario final". Esta definición es cónsona al carácter de adquisición y utilidad exhibido por la señora Maisonet Rodríguez de acuerdo con lo alegado en su *Querella*. Por tanto, el mero hecho de que la querellante haya expresado que adquirió y utilizó el vehículo de motor como instrumento de trabajo, no priva a la agencia de ejercer su jurisdicción y proveer los remedios correspondiente a su reclamación.

A su vez, precisamos que aunque la parte recurrente solicita que nos circunscribamos a la *Interpretación del Secretario 2006-03* y a las resoluciones administrativas anejadas en este recurso, no estamos obligados a la aplicación estricta de estas.[13]

---

[13] Apéndice de parte recurrente, págs. 213-234.

**Las fuentes citadas tienen fuerza persuasiva, mas no resultan vinculantes a nuestro examen jurisdiccional, y además, se apartan notoriamente de las circunstancias que motivan el presente recurso.** Véanse, *San Gerónimo Caribe Project v. ARPe*, 174 DPR 640, 671 (2008*); Maldonado v. Junta Planificación*, 171 DPR 46, 67 (2007). (Énfasis nuestro). Atendido este argumento, procedemos a discutir la controversia medular de este recurso. Veamos.

Respecto a la controversia de incumplimiento del servicio de garantía, notamos que Bella International centra su contención en la impugnación de la prueba admitida ante el DACo. Señala que la agencia incidió al concluir que no corrigió la condición aducida por la querellante. Luego de evaluar el expediente, no encontramos fundamentos jurídicos para acoger tal señalamiento. **La señora Maisonet Rodríguez presentó prueba sustancial para prevalecer en el pleito administrativo**. (Énfasis nuestro). Veamos.

En virtud de la Regla 24 del Reglamento de Procedimientos Administrativos, el DACo celebró dos vistas administrativas. Surge de la transcripción de la prueba oral, que los testimonios de la querellante y de su perito demostraron que el automóvil que compró no funcionaba adecuadamente. Al respecto, la querellante recurrida declaró que el ruido continuó, a pesar de que en numerosas ocasiones solicitó la reparación:

> **P. Y usted dice que volvía a hacer el ruido. ¿Y qué usted, y que, si algo, usted hacía cuando escuchaba el ruido?**
>
> **R. Bueno, lo que pasa es que el ruido pues es un ruido constante, obviamente, incómodo, asusta, porque en algunos momentos pues no era un po (onomatopeya), era un ruido más grande que se sentía en el área del ʽdashʼ. Pues, yo siempre decía... Me preguntaban si era en una misma área. "Yo a veces lo, a veces lo escucho frente al guía, a veces lo escucho más a la derecha", porque es así. Y es sumamente incómodo el ruido que**

> **se escucha; crea, pues, obviamente inseguridad porque
> yo no sé qué está ocurriendo. Me han dicho ya que han
> sido cables, que han sido conectores y no se resuelve
> el ruido…**
>
> **P. ¿Y después de esa ocasión del 30 de junio, alguna
> vez usted volvió a, a reclamar por ese…**
>
> **R. Bueno por ese ruido yo he ido doce veces.**
>
> **P. ¿Doce veces?**
>
> **R. Doce veces. Por ese ruido específicamente**.[14]
> (Énfasis nuestro).

Cónsono con su testimonio, del expediente se desprende que, la entidad querellada realizó, a solicitud de la señora Maisonet Rodríguez, una serie de inspecciones para identificar las causas que provocaban el ruido. Sin embargo, mediante estos continuos exámenes, los técnicos automotriz identificaron otros desperfectos, tales como: (1) daños internos del sistema de radio conocido como *infotaiment control unit*[15], (2) desgaste prematuro del techo panorámico[16], (3) desgaste del gozne de la puerta[17], (4) descuadre de la compuerta[18], y (4) reemplazo de batería del vehículo[19].

Ante tal contexto, la querellante recibió dos notificaciones intituladas *Extensión de Garantía* por problemas atinentes a la fabricación del vehículo de motor.[20] En lo pertinente, esbozamos la siguiente comunicación sobre el servicio de garantía fechada en **abril de 2021:**

> En algunos modelos RDX 2019, una conexión suelta en la red bus MOST está ocasionando lo siguiente:
>
> - Un estallido o chasquido proveniente de los altavoces, una pantalla en blanco o no hay sonido del sistema de audio.

---

[14] TPO del 8 de septiembre de 2023, pág. 34. Véase, además, el amplio historial de visitas en búsqueda de la atención de los desperfectos del automóvil en cuestión durante el **3 de enero de 2020 al 15 de febrero de 2023.** Apéndice de la parte recurrente, págs. 57-131.
[15] Apéndice de parte recurrente, pág. 87.
[16] *Íd.*, pág. 74.
[17] *Íd.*, pág. 71.
[18] *Íd.*, pág. 67.
[19] *Íd.*, pág. 58.
[20] *Íd.*, págs. 133 y 147.

- Mensajes de "Network Loss" (Pérdida de Red) y/o Modo de conducción no está disponible o el mensaje de extensiones de responsabilidad está atascado (trabado)
- La pantalla central se mantiene encendida después de colocar el vehículo en el modo OFF (Apagado) con la puerta abierta.
- La pantalla cambia entre el modo Día y el modo Noche.

En algunos modelos RDX 2020, una conexión suelta en la red bus MOST está ocasionando lo siguiente:

- Un estallido o chasquido proveniente de los altavoces, una pantalla en blanco o no hay sonido del sistema de audio.
- Un mensaje de "Network Loss" (Pérdida de Red).

Para los vehículos que muestran cualquiera de los síntomas respectivamente mencionados anteriormente, American Honda está extendiendo la garantía para la red bus MOST en estos vehículos, a 6 años de la fecha original de compra o 74.000 millas, lo que ocurra primero.[21]

De manera similar, en **julio de 2023** recibió el siguiente comunicado respecto al servicio de garantía:

En algunos modelos RDX 2019-20, no se fabricó un terminal de cable coaxial con las especificaciones adecuadas. Un terminal fabricado incorrectamente puede dar lugar a una comunicación deficiente en la red bus del sistema orientado a los medios (MOST), lo que puede afectar potencialmente a la calidad del sonido del audio.

Para asegurar su confianza en su vehículo, Acura está extendiendo la cobertura de la garantía de los cables de servicio FAKRA a 8 años o 100, 000 millas a partir de la fecha original de compra lo que ocurra primero.[22]

**Lo anterior devela que el vehículo de motor presentaba una serie de vicios, que de haberlos conocido, la parte querellante no hubiera incurrido en la compraventa de este. No obstante, ninguna de las gestiones de reparación ni las extensiones de garantía produjeron una corrección del ruido alegado.** (Énfasis nuestro).

A los fines de sustentar este historial de inspecciones, testificó el señor David Rivera Valcárcel como perito de la parte querellante. Efectuada su calificación pericial, declaró que inspeccionó el vehículo de motor.[23] A pesar de que inicialmente

---

[21] *Íd.,* pág. 133.
[22] *Íd.*, pág. 147.
[23] TPO de la vista administrativa del 1 de noviembre de 2023, págs. 5

no identificó el ruido, en el segundo examen, entiéndase, **el 26 de junio de 2023**, tuvo constancia de esta condición:

> R **Pues le, antes de que, cuando se fue doña Mildred le dije: "Pues sí, cuando usted sienta más el ruido, pues me da una llamadita que yo siempre estoy aquí, en casa". Entonces, el 26 de junio ella pasó por mi casa. Salimos de Caimito hacia la carretera de Caguas, salimos hacia Juncos y cuando subimos hacia Cayey ahí siento las explosiones.**[24] (Énfasis nuestro).

El testigo describió la referida condición de la siguiente manera:

> Es como si fuera esto. Sentí, tú sabes, cuando **un ti (onomatopeya), un tata (onomatopeya), por el área entre la, el `dash´ y eso.** Entonces, procedimos, llegamos a, otra vez a Caimito y de ahí hice las conclusiones por lo... orden de, de reclamación, y ahí fue que hice las conclusiones.[25] (Énfasis nuestro).

Tal declaración resulta consistente con el informe pericial intitulado *Hallazgos o Evaluación de Vehículo Honda Acura RDX 2020 con fecha de compra 30 de octubre de 2019.*[26] Este documento recoge la siguiente observación:

> **Para fecha 26 de junio de 2023 se manejó vehículo ruta de San Juan a Juncos y de Juncos a Cayey. El ruido se escuchó detrás del panel de relojería y el *dash*. Se escucha como si fuera un salto de corriente en una explosión cuando uno pega dos cables para hacer chispa en forma de una activación de un *relay*.**
>
> **Nota: El riesgo de ese fallo puede presentar un corto circuito que pudiera ocasionar el incendio de la guagua u ocasiona[r] un accidente a otro vehículo.**[27] (Énfasis nuestro).

También puntualizamos que su testimonio pericial es consistente con la versión brindada por el señor Aponte Ortiz, investigador de querellas del DACo. A pesar de que en su inspección no identificó el ruido en la consola vehicular, sí percibió un sonido en el techo panorámico:

> P. ¿Y se detectó?
>
> **R. El ruido del `sunroof´, sí.**

---

[24] TPO de la vista administrativa del 1 de noviembre de 2023, págs. 50-51.
[25] TPO de la vista administrativa del 1 de noviembre de 2023, pág. 51.
[26] Surge del expediente ante nuestra consideración que, el perito y el técnico rindieron ese informe el **28 de julio de 2023**. Véase, Apéndice de parte recurrente, págs. 170-171.
[27] Apéndice de parte recurrente. pág. 171.

P. No, estoy hablando del, 'dash' 'dash'

R. No, lo del 'dash' no. Incluso, creo que colocamos el vehículo en varias posiciones, para ver si presentaba algún tipo de ruido, y no, no lo realizó.[28] (Énfasis nuestro).

Además, este no descartó la posibilidad de que el desperfecto continuara, pues su conclusión está limitada al momento de esa inspección:

[L]icenciado, yo solamente hago mi informe con lo que yo encuentre al momento de realizar la inspección. **Yo no puedo descartar nada**, pero en el momento eso fue lo que yo encontré.[29]

A la luz de tales testimonios, la agencia en su ejercicio de apreciación de la prueba concedió mayor valor probatorio al testimonio de la querellante y su perito. Como parte de su función adjudicativa, otorgó credibilidad a la versión de la señora Maisonet Rodríguez, quien relató que visitó el Centro de Servicios en numerosas ocasiones. Mediante la prueba oral y documental desfilada, demostró que constantemente solicitó a Bella International la inspección y la corrección de los desperfectos vinculados con el ruido percibido en su vehículo de motor. Sin embargo, los procedimientos que llevó a cabo la entidad querellada solo develaron que el automóvil presentaba múltiples vicios ocultos.

Así quedó confirmado con la prueba pericial debidamente admitida ante la agencia. El testimonio del señor Rivera Valcárcel no se apartó de lo previamente relatado por la señora Maisonet Rodríguez. En su segunda inspección, este escuchó el ruido, el cual catalogó como un indicador de un corto circuito que pudiera ocasionar el incendio de la guagua u ocasionar un accidente a otro vehículo.[30] El juzgador de los hechos concedió valor

---

[28] TPO de la vista administrativa del 8 de septiembre de 2023, pág. 14.
[29] TPO de la vista administrativa del 8 de septiembre de 2023, pág. 17.
[30] Apéndice de parte recurrente, pág. 171.

probatorio a su testimonio por estar basado en hechos e información suficiente. **Por tanto, a pesar de que estamos en igual posición que la agencia para evaluar la prueba pericial, no vemos motivos jurídicos para intervenir en su apreciación**.

Adviértase que, Bella International no presentó ante la agencia algún testimonio o prueba documental en contrario que permitiera resolver a su favor. En lo pertinente, el señor Heriberto Seda compareció en calidad de perito de ocurrencia. No obstante, la parte querellante objetó su intervención debido a que no se anunció su comparecencia en tal calidad y tampoco se calificó como perito. Tras una extensa argumentación de ambas partes, la representación legal de Bella International intentó continuar el examen de preguntas.[31] Sin embargo, la parte querellante oportunamente objetó sus interrogantes por resultar sugestivas:

> P. ¿Y aparte, aparte del sonido en el 'sunroof' y un sonido en el 'brake swich', usted detectó, percibió algo más en el vehículo durante la prueba?
>
> R. No.
>
> P. Le pregunto, ¿desde ese día hasta el día de hoy, usted ha visto ese vehículo?
>
> R. No
>
> P. Y le pregunto, ¿desde ese día hasta el día de hoy, a ese vehículo, según el historial de servicio, se le ha realizado algún servicio relacionado con las quejas?
>
> R. No.
>
> LCDO. ESTADES.
>
> Sugestivo.
>
> OFICIAL EXAMINADORA:
>
> Sí.[32]

Así las cosas, el representante legal dio por terminado el examen de preguntas.[33] Considerado lo anterior, disponemos que esa limitada prueba oral presentada en notorio contraste con la

---

[31] TPO de la vista administrativa del 1 de noviembre de 2023, pág. 153-163.

[32] TPO de la vista administrativa del 1 de noviembre de 2023, págs. 165-166.

[33] TPO de la vista administrativa del 1 de noviembre de 2023, págs. 165-166.

prueba de la querellante resultó insuficiente para demostrar que corrigió el desperfecto en controversia.

Ante el evidente incumplimiento del servicio de garantía, sostenemos que el DACo resolvió correctamente al decretar la resolución el contrato de compraventa al amparo de la Regla 22 del Reglamento de Garantías de Vehículos de Motor:

> El Departamento podrá, a opción del comprador, decretar la resolución del contrato o reducir proporcionalmente el precio de venta de acuerdo con el Código Civil de Puerto Rico, en aquellos casos en que el vendedor, distribuidor autorizado o concesionario, distribuidor de fábrica, tuvo oportunidad razonable para reparar uno o más defecto, pero no quiso o no pudo corregirlos. Lo que constituye oportunidad razonable para reparar se determinará tomando en consideración las circunstancias particulares de cada caso. Regla 22, Reglamento 7159, *supra*.

Reiteramos que no incidió en su determinación, pues de los hechos se desprende, así como de la prueba corroborativa, que la querellante ofreció amplia oportunidad a Bella International para atender el desperfecto del ruido. **Sin embargo, no obtuvo la reparación adecuada. Ello implicó que no recibió el servicio de garantía según estipulado en ley y reglamento. Lo cual, a su vez, constituyó una privación del derecho que ostentaba como consumidora por la compraventa del vehículo de motor**. (Énfasis nuestro).

Por último, respecto a los honorarios de temeridad, no encontramos los elementos jurídicos para intervenir en esta determinación. El DACo no se apartó del ámbito legal al decretar su imposición. Notamos que la representación legal de Bella International incurrió en una serie de actuaciones que generaron una demora innecesaria en la solución del problema. Sobre este proceder, observamos que del expediente surgen cuatros (4) misivas dirigidas a los abogados de la entidad querellada.[34] El

---

[34] Apéndice de parte recurrente, págs. 154-166.

contenido de estas cartas procuraba resolver la controversia legal de una manera armoniosa sin la necesidad de tramitar un proceso adjudicativo ante la agencia y evitar gastos mayores. A pesar de estas gestiones, la representación legal adoptó una postura obstinada que privó a la parte querellante de su derecho como consumidora.

Asimismo, contemplamos que la representación legal de la parte querellada presentó sorpresivamente un perito de ocurrencia sin ser debidamente anunciado y calificado. Este proceder generó un amplio debate entre las partes, según recogido en la transcripción oral estipulada.[35] A pesar de la insistencia en la presentación de este testigo, el abogado de Bella International expresó: "Yo no tengo necesidad, Vuestro Honor, de preguntarle sobre el historial de servicio, porque cubrí completo con la dama".[36] Luego de una brevísima intervención de preguntas, dio por concluido el proceso. Lo anterior reitera su conducta temeraria y contumaz desplegada en este caso.[37] Considerada tal actuación y respetada la discreción del juzgador de los hechos, no identificamos fundamentos legales para intervenir en la imposición de los honorarios impugnados.

A la luz del marco legal reseñado, disponemos que la determinación administrativa merece nuestra deferencia. La *Resolución* agencial es cónsona con los preceptos legales aplicables y está respaldada en la totalidad de la evidencia sustancial obrante en el expediente administrativo. Así expuesto, nos vemos limitados a intervenir con esta decisión, pues no identificamos una actuación arbitraria, irrazonable o ilegal por

---

[35] TPO de la vista administrativa del 1 de noviembre de 2023, pág. 153-163.
[36] TPO de la vista administrativa del 1 de noviembre de 2023, pág. 163.
[37] TPO de la vista administrativa del 1 de noviembre de 2023, pág. 164-166.

parte del DACo. En vista de ello, confirmamos la determinación administrativa recurrida.

**IV.**

Por los fundamentos expuestos, **confirmamos** la *Resolución* administrativa recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones